**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MEYERS ASSOCIATES, L.P.,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Case No. 3:14-cv-1174** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **BARRY GOODMAN AND DANA GOODMAN,** | ) | |
| | ) | |
| **Respondents,** | ) | |

## MEMORANDUM

On March 21, 2014, an arbitration panel issued an award in favor of Barry Goodman and

Dana Goodman (the "Goodmans") and against Meyers Associates, L.P. ("Meyers"). Meyers has

filed a Petition to Vacate Arbitration Award (Docket No. 1), and the Goodmans have filed a

Cross-Petition to Confirm Arbitration Award (Docket No. 14). For the reasons stated herein,

subject to one clarification concerning the calculation of prejudgment interest, Meyers' Petition

to Vacate will be denied, and the Goodmans' Cross-Petition to Confirm will be granted.

## BACKGROUND

### I.  The Arbitration

The Financial Industry Regulatory Authority ("FINRA") is a self-regulatory organization

made up of brokerage firms, including Meyers Associates, L.P. FINRA handles the dispute

resolution process between customers and their brokerage firms. The arbitration process is

governed by the FINRA's Code of Arbitration Procedure for Customer Disputes (the "FINRA

Arbitration Code"). (*See* Docket No. 15, Oakes Decl. ¶ 3 and Ex. 1.)

The Goodmans' claims relate to brokerage accounts at Meyers that they maintained between October 25, 2005 and August 8, 2008 through Meyers' registered representatives.[1] On December 18, 2006, the Goodmans signed a customer agreement form with Meyers, by which the Goodmans acknowledged that any disputes with Meyers would have to be submitted to binding arbitration under an arbitration agreement.[2]

On November 15, 2010, in accordance with the binding arbitration agreement that they had signed with Meyers, the Goodmans filed a FINRA Arbitration Submission Agreement, whereby they submitted their grievances against Meyers to binding arbitration under the FINRA Arbitration Code. (Oakes Decl., Ex. 3.) On November 22, 2010, the Goodmans filed a Statement of Claim against Meyers, in which they asserted violations of the Tennessee Securities Act, Tenn. Code Ann. § 48-2-101 *et seq.* ("TSA"), breach of fiduciary duty, common law fraud, breach of contract, negligent misrepresentation, and negligent supervision. (*Id.*, Ex. 5.) Broadly, the Goodmans claimed that Meyers' registered representative, Michael Desano, had mishandled the Goodmans' investments by engaging in excessive trading to generate commissions (referred to as "churning") and by making highly speculative investments that were not suited to the Goodmans' needs (referred to as making "unsuitable" investments), both of which depleted the

---

[1] It appears that the Goodmans originally opened a brokerage account in October 2005, which they later consolidated into a Meyers brokerage account in December 2006. The parties have referred interchangeably to the Goodmans' "account" (singular) or to their "accounts" (plural). For purposes of linguistic simplicity only, the court will refer to the set of transactions from October 2005 forward as relating to the Goodmans' "account" with Meyers.

[2] The Oakes Declaration attaches a copy of the parties' signed acknowledgement that they would submit grievances to binding arbitration. The acknowledgement form appears to reference another document containing the terms of the pre-dispute arbitration agreement. Although it is not material to the pending petition and cross-petition, the court notes that the underlying arbitration agreement itself does not appear to be in the record.

accounts significantly.  The Goodmans claimed that Meyers negligently failed to supervise Desano, thereby permitting Desano to engage in this "blatant unsuitable and self-serving conduct."  The Goodmans demanded damages reflecting the value of their account or as appropriate under the TSA, attorney's fees and costs, prejudgment interest, and post-judgment interest.  With respect to prejudgment interest, the Goodmans claimed, by reference to caselaw authority, that the Panel could award prejudgment interest even if there were no statutory basis for an award of prejudgment interest.  The Goodmans also demanded punitive damages, referencing caselaw authority for the propositions that FINRA arbitration panels are not bound by state law restrictions on punitive damages and that the Panel's punitive damages award would be subject only to the restrictions of the Due Process Clause of the United States Constitution.

On February 8, 2011, in response to the Goodmans' Statement of Claim, Meyers also signed a Submission Agreement consenting to the FINRA arbitration proceeding.  On February 10, 2011, Meyers filed an Answer to the Goodmans' Statement of Claim, in which it denied the allegations and asserted various affirmative defenses.  (*Id.*, Ex. 6; Petition to Vacate, Ex. C.) Meyers generally challenged the Goodmans' view of the facts, contending that the facts actually showed that the Goodmans were sophisticated investors, that all trades had been made pursuant to their stated investment strategy, that the Goodmans never objected to the suitability of the transactions on the account, and that they approved all of the trades in the account.  (Answer at pp. 1-4.)  Meyers also asserted several defenses, arguing, by reference to legal authority, that (1) it did not owe a fiduciary duty to the Goodmans because their account was non-discretionary, and (2) their failure to report improper activity on the account after learning of that improper conduct precluded any recovery for account losses, under the doctrines of ratification, waiver, estoppel, mitigation, contributory negligence, or "avoidable consequences."  (*Id.* at pp. 4-6 and

9.)  By reference to legal authority, Meyers also asserted that the Goodmans could not demonstrate each element of a churning theory of liability.  (*Id.* at 6-8.)  Finally, Meyers listed additional affirmative defenses.  In most relevant part, (1) Meyers stated, by reference to non-Tennessee authority, that attorney's fees should not be awarded, (2) Meyers stated, without reference to any legal authority, that "[c]laimants are not entitled to any award of punitive damages under the law and has additionally failed to allege conduct against Meyers which could support such an award against Meyers."  (*Id.* at 9-10.)  Meyers' Answer did not reference Tennessee law (caselaw or statutory law) in any respect, let alone discuss its potential application to the Goodmans' claims.  Meyers did not assert a statute of limitations defense (under Tennessee law or otherwise), even among its final laundry list of affirmative defenses.  Meyers did not challenge the Panel's authority to award prejudgment interest, nor did it urge the Panel to utilize any particular procedures in considering the Goodmans' demand for punitive damages.

After the parties filed their initial pleadings, they engaged in the selection of a three-member arbitration panel in compliance with procedures set forth in the FINRA Arbitration Code.  (*See* FINRA Arbitration Code Rules 12400-12407.)  Under those procedures, the parties receive the names and disclosure reports of 30 potential arbitrators, ten for each Panel category of Chairperson, Public Arbitrator, and Industry Arbitrator.[3]  The disclosure reports include a detailed summary of each potential arbitrator's employment history and educational background, along with a list of every available award in which that person has participated as a member of a FINRA arbitration panel, copies of which are publicly available on FINRA's website.  Subject to certain limitations, the parties may strike the names of particular arbitrators and submit their

---

[3] As the court understands the procedures, the final Panel must include one arbitrator from each category.

respective rankings of the remaining arbitrators to FINRA, which uses a formula to determine the final composition of the Panel.

Here, following this process, FINRA designated a panel of three arbitrators to resolve the Goodmans' claims (the "Panel"). The Panel included Chairperson Jeffrey M. Bain, Public Arbitrator Donna Pavlick, and (non-public) Industry Arbitrator R. Thomas Barksdale. As of the date FINRA constituted the Panel, the Panel members had the following qualifications: Bain had been a practicing attorney for nearly four decades, was a former prosecutor, white collar criminal defense attorney, and civil litigator with extensive trial experience, had served on 127 FINRA arbitration panels that had rendered an award, and had also served on arbitration panels of the National Association of Securities Dealers ("NASD") and the New York Stock Exchange (Oakes Decl., Ex. 7); Pavlick was an Assistant Dean at Vanderbilt Law School, was a former Naval officer, possessed a B.S., a J.D., an M.A., an L.L.M. in dispute resolution, and a Ph.D., and had served on two prior FINRA arbitration panels that had rendered an award (and was assigned to three additional panels in which an award had not yet been rendered) (*id.*, Ex. 8); Barksdale had worked for brokerage firms for about fifty years, held numerous securities licenses, and had served as a FINRA Industry Arbitrator in 17 FINRA arbitration cases in which an award was rendered (*id.*, Ex. 9).

On April 28, 2011, the Panel issued a Scheduling Order that set forth a discovery deadline, hearing dates, and a date for the parties to submit optional pre-hearing briefs. (Oakes Decl., Ex. 10.) On February 11, 2013, the Goodmans filed a pre-hearing brief. (*Id.*, Ex. 11.) In their brief, the Goodmans asserted that Desano had flagrantly mismanaged the Goodmans' investment money to line his own pockets. The brief provided substantial legal authority supporting Meyers' liability for Desano's conduct. The brief also claimed, with citation to legal

authority, that Meyers could be held liable even if the Goodmans' account were non-discretionary because the broker controlled the Goodmans' account. The brief contained sections (with supporting citations to statutes, caselaw, and other legal authority) requesting compensatory damages generally, net out-of-pocket losses plus prejudgment interest and attorney's fees and costs under the TSA, additional damages based on a "well-managed portfolio" theory, prejudgment interest under Tenn. Code Ann. § 47-14-123 [Tennessee's general prejudgment interest statute], and punitive damages under *Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326 (Tenn. 1996) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W. 896 (Tenn. 1992)).[4] The Goodmans also argued, with citations to caselaw and other legal authorities, that Meyers' "mitigation" defense was inappropriate in an intentional fraud case.

Remarkably, Meyers elected not to file a pre-hearing brief.

The arbitration hearing took place over nine days and included testimony from numerous witnesses through direct and cross examination.[5] The Goodmans testified about their relationship with Meyers and its brokers, including Desano, and about the manner in which those brokers had handled the Goodmans' account. (Oakes Decl. ¶ 21.) The Goodmans also presented testimony from two retained experts, James Port and Howard Bloom. (*Id.* ¶¶ 23-24.) Port testified for two days about liability issues, opining that Meyers had breached various duties to the Goodmans, that the Goodmans' account had been mismanaged and churned, and that

---

[4] The conclusion to the brief also requested the filing and forum fees incurred by the Goodmans.

[5] The hearing dates were February 26-28, 2013, March 1, 2013, January 8-10, 2014, and January 16 and 20, 2014. (Docket No. 1 ¶ 4.)

Meyers' supervision failed to meet industry standards.[6]  (*Id.* ¶ 23.)  Bloom, a licensed CPA (and member of the Illinois bar) with extensive experience providing damages testimony in judicial and arbitral proceedings, presented to the Panel calculations of the Goodmans' damages, including calculations regarding trading and commissions.  (*See, e.g.*, *Oakes Decl.*, ¶ 24 and Ex. 16, Damages Calculation (16 pages)).

Desano and two other fact witnesses testified for Meyers.  (*Id.* ¶ 22.)[7]  Meyers did not present expert testimony on its own behalf.  (*Id.* ¶ 25.)

At the conclusion of the hearing, both parties acknowledged that they had received a full and fair opportunity to be heard.  (*Id.* ¶ 29.)

On March 21, 2014, the Panel issued a unanimous Award in favor of the Goodmans (the "Award") and against Meyers.  (Oakes Decl. ¶ 30, Ex. 4; Petition to Vacate, Ex. A.)  Without providing its reasoning, the Award states as follows: (1) Meyers is "liable" to the Goodmans and must pay them $222,585.39 in compensatory damages; (2) Meyers is "liable" and must pay punitive damages of $100,000 under *Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326 (Tenn. 1996) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W. 896 (Tenn. 1992)); (3) Meyers is "liable" and must pay the Goodmans $104,000 in attorney's fees under Tenn. Code Ann. § 48-1-112(f) [a provision of the TSA]; (4) Meyers is "liable" and must pay "interest at the legal rate of 10% from November 22, 2010, through the date of this Award" under Tenn. Code Ann. § 47-14-123

---

[6] Port has worked in the securities industry since the late 1990s, including employment with multiple brokerage firms.  (Oakes Decl. ¶ 23 and Ex. 14 (curriculum vitae)).

[7] The Oakes Declaration states that a broker assistant to Desano testified for Meyers.  The declaration does not reference an additional fact witness.  In the Goodmans' brief, the Goodmans represent that Meyers presented testimony from two witnesses in addition to Desano, a representation that Meyers does not appear to dispute.  Although it is not material, the court will presume that Meyers presented three fact witnesses (Desano and two others) at the hearing.

[Tennessee's general prejudgment interest statute], (5) Meyers is "liable" to pay costs of $20,297.48; and (6) Meyers is "liable" to pay $300.00 of the Goodmans' claim filing fee.[8]

Because the Award is not an explained decision, it is essentially impossible to determine which claims the Panel found had been proven (perhaps one, perhaps all), which general theory or theories of liability (churning, suitability, generally fraudulent conduct, or otherwise) it found to be persuasive, which claim or claims it believed supported a punitive damages award, what evidence or legal arguments it found to be persuasive, and what legal principles purported to animate its decision.

Here, as it relates to the legal principles behind the Panel's Award, the parties debate what necessary inferences are permissible from the Award. The Award does establish that the Panel must have found that the Goodmans proved their TSA claim, because the Panel awarded attorney's fees specifically by reference to the TSA attorney's fee provision. However, the court cannot conclude that the Panel only found *liability* based on a TSA violation, because the Panel may also have found other violations that supported the non-punitive damages portions of the Award. The information also establishes that the Panel believed that punitive damages were justified under *Coffey* and *Hodges* and that prejudgment interest was justified by Tennessee's

---

[8] Under § 12904(f) of the FINRA Arbitration Code, a panel's award does not need to state the rationale for the award. However, under § 12904(g), the parties have the option jointly to request an "explained decision," which is "a fact-based award stating the general reason(s) for the arbitrators' decision." Notably, even as to an explained decision requested under § 12904(g), "[i]nclusion of legal authorities and damages calculations is not required." The chairperson receives a special honorarium for writing an explained decision. Here, the Panel issued a decision that does not contain fact-based reasoning, and the Award's schedule of fees accordingly does not include an honorarium for an "explained decision." There is no indication that the parties requested an explained decision. An explained decision would not have included legal authority and damages calculations in any case; presumably, Meyers was aware of these limitations (and the difficulties it would present to a reviewing court) when it included a mandatory arbitration clause in its brokerage agreement.

prejudgment interest statute.  Those are the only necessary inferences the court can draw from the Award.

## II. <u>Cross-Petitions</u>

Meyers filed this action as a Petition to Vacate the Award.  Meyers seeks relief under an exceedingly narrow basis for judicial review: Meyers contends that, in multiple respects, the Panel exhibited "manifest disregard of the law" in rendering its Award.  In support of its Petition, Meyers has filed a Memorandum of Law (Docket No. 10, Ex. 1) and supporting exhibits (Docket No. 1 (attachments)).[9]  In response, the Goodmans have filed a Cross-Petition to Confirm the Award, in support of which they have filed a Memorandum of Law (Docket No. 16) and the Declaration of Bruce Oakes (Docket No. 15 (with attachments)).  Meyers filed an Answer to the Goodman's Cross-Petition to Confirm Arbitration Award (Docket No. 26), in support of which Meyers filed a Memorandum of Law (*id.*, Attach. No. 1 (with exhibits)) and the supporting Declaration of David Schrader (*id.*, Attach. No. 2 (with exhibits at Attach. Nos. 3-7).)

## <u>LEGAL STANDARD FOR REVIEW OF AN ARBITRAL AWARD</u>

"When courts are called on to review an arbitrator's decision, the review is very narrow; it is one of the narrowest standards of judicial review in all of American jurisprudence."  *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 305 (6th Cir. 2008) (quoting *Lattimer-Stevens Co. v. United Steelworkers*, 913 F.2d 116, 1169 (6th Cir. 1990)).  The Federal Arbitration Act ("FAA"), 9 U.S.C. § 2 *et seq.*, controls whether a federal court may confirm, vacate, or modify an arbitration award.  Under § 10 of the FAA, a court may vacate an award in four enumerated instances:

---

[9] Meyers originally filed a Memorandum of Law that incorrectly stated the law concerning the TSA statute of limitations and repose.  (Docket No. 2.)  Meyers filed an amended Memorandum of Law (Docket No. 10), which contains a revised section relating to that TSA provision.

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).[10]

In addition to these four stated grounds for vacating an arbitration award under the FAA, a district court "may vacate an award where the arbitrators have manifestly disregarded the law." *See Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000); *Merrill Lynch, Pierce, Fenner & Smith v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995); *Physicians Ins. Capital v. Praesidium Alliance Grp.*, 562 F. App'x 421, 423 (6th Cir. 2014); *Coffee Beanery, Ltd. v. W.W., L.L.C.*, 300 F. App'x 415, 418 (6th Cir. 2008).[11]  As the Sixth Circuit has explained, this is an exceptionally difficult standard to meet:

---

[10] Under § 11 of the FAA, a district court may also modify or correct an arbitration award under certain circumstances.

[11] As the Sixth Circuit and many other federal courts have observed, there is a legitimate question as to whether the "manifest disregard" standard survived the Supreme Court's decision in *Hall Street Assocs. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008).  As explained recently in *Shafer v. Multiband Corp.*, 551 F. App'x 814 (6th Cir. 2014):

> In *Hall Street*, the Supreme Court held that "the statutory grounds [for vacatur] are exclusive, but went on to say that "[m]aybe the term 'manifest disregard' was meant to name a new ground for review, but maybe it merely referred to the § 10 grounds collectively, rather than adding to them."  After *Hall Street*, the circuits split over whether "manifest disregard" was still a viable ground for overturning an arbitration decision.  In 2010, the Supreme Court wrote in dicta, "We do not

[M]anifest disregard of the law is a very narrow standard of review. A mere error in interpretation or application of the law is insufficient. Rather, the decision must fly in the face of clearly established legal precedent. When faced with questions of law, an arbitration panel does not act in manifest disregard of the law unless (1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle.

---

decide whether 'manifest disregard' survives our decision in *Hall Street* as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth in 9 U.S.C. § 10." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 [] (2010). Since *Hall Street*, we have continued to acknowledge "manifest disregard" as a ground for vacatur – albeit not in a published holding.

*Shafer*, 551 F. App'x at 819 n.1 (applying manifest disregard standard) (non-Supreme Court citations omitted).

Notably, subsequent to *Hall* and *Stolt-Nielsen*, the Fifth, Eighth, and Eleventh Circuits in published cases have found that the "manifest disregard" doctrine no longer survives as an independent ground for vacatur. *See Frazier v. CitiFinancial Corp.*, 604 F.3d 1313, 1324 (11th Cir. 2010); *Citigroup Global Mkts, Inc. v. Bacon*, 562 F.3d 349, 355 (5th Cir. 2009); *Med. Shoppe Int'l, Inc. v. Turner Invs., Inc.*, 614 F.3d 485, 489 (8th Cir. 2010). Nevertheless, this issue seems to have evaded definitive resolution within the Sixth Circuit (and elsewhere) because the standard is so difficult to satisfy in the first place, meaning that courts generally can (and should) deny petitions to vacate without having to confront the continuing viability of the doctrine. Nevertheless, resolution in a published case as to whether the doctrine survives within this circuit would be significant, because parties (as Meyers does here) continue to attempt to use the doctrine as an exception that would swallow the rule that arbitral awards are essentially definitive. Resolution in a published decision would either (a) reassure district courts that the time and expense of conducting a "manifest disregard" review is a worthwhile endeavor (if the doctrine remains viable), or (b) relieve district courts of the burdens of addressing petitions along these lines (if the doctrine is no longer viable).

Notwithstanding these concerns, for purposes of this opinion, this court will assume, as the Sixth Circuit has continued to do in unpublished cases, that the "manifest disregard" doctrine remains a valid basis for vacating an arbitration award. The court also notes that the issue is the subject of a pending petition for writ of *certiorari* to the United States Supreme Court in *Republic of Argentina v. BG Group PLC*, Supreme Court Docket No. 14-211 (docketed August 21, 2014) (distributed for conference of October 31, 2014).

*Merrill Lynch*, 70 F.3d at 421. "The limited review applied in such a situation, however, is meant to avoid 'full-bore legal and evidentiary appeals that can render informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process.'" *Praesidium*, 562 F. App'x at 423 (quoting *Hall Street Assocs. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008)) (additional internal quotations marks and brackets omitted).

"Even a misapplication of well defined and explicit legal principles does not constitute manifest disregard." *Merrill Lynch*, 70 F.3d at 421. In other words, "to find manifest disregard of the law a court must find two things: the relevant law must be clearly defined and the arbitrator *must have consciously chosen not to apply it.*" *Dawahare*, 210 F.3d at 669 (emphasis added); *see also Glennon v. Dean Witter Reynolds*, 1994 WL 757709, at *3 (M.D. Tenn. Dec. 15, 1994) ("[T]he term 'disregard' implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it.") (quoting *Merrill Lynch, Pierce, Fenner & Smith v. Bobker*, 808 F.2d 930 (2d Cir. 1986)).

Where "the arbitrators decline to explain their resolution of certain questions of law, a party seeking to have the award set aside faces a tremendous obstacle." *Merrill Lynch*, 70 F.3d at 421; *accord Praesidium*, 562 F. App'x at 423. In that circumstance, "[i]f a court can find any line of argument that is legally plausible and supports the award then it must be confirmed. Only where no judge or group of judges could conceivably come to the same determination as the arbitrators must the award be set aside." *Merrill Lynch*, 70 F.3d at 421. As the Sixth Circuit has explained, if arbitrators choose not to explain their decision, "it is *all but impossible* to determine whether they acted with manifest disregard of the law." *Dawahare*, 210 F.3d at 669 (emphasis added).

When an arbitrator resolves disputes, "the arbitrator's improvident, even silly factfinding does not provide a basis for a reviewing court to refuse to enforce the award." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001).

In *Dawahare v. Spencer*, the Sixth Circuit confronted circumstances somewhat similar to those presented here. An individual opened a brokerage account after receiving "cold calls" from a broker. *Dawahare*, 210 F.3d at 668. The broker engaged in "short trading" that caused the account to lose approximately $500,000 in value. *Id.* Under a pre-dispute arbitration agreement with the brokerage firm, the individual submitted the matter to arbitration before a NASD arbitration panel. *Id.* The NASD panel found for the plaintiff on some claims but against the plaintiff on others. *Id.* The arbitrators' decision outlined the parties' contentions, discussed the claims, and identified the evidence presented, after which the award "simply designated the amount of damages without detailed explanation." *Id*. at 670. The plaintiff moved a federal district court to vacate the award, contending that the panel had manifestly disregarded the law by issuing a damages award that did not comport with the evidence presented to the panel. *Id*. at 668-669.

After the district court refused to vacate the award, the Sixth Circuit considered the issue on appeal. In the absence of any stated reasoning by the arbitration panel, the *Dawahare* court found that "[i]t is difficult to say that the arbitrators refused to heed a clearly defined legal principle. Dawahare points to nothing in the record that shows *the arbitrators' awareness of the common law* that he alleges to be applicable. This is not a case where one of the parties *clearly stated the law* and *the arbitrators expressly chose not to follow it*." *Id*. at 670 (emphases added). The Sixth Circuit reiterated that it was important for a party seeking vacatur to show that it had explained the applicable law to the arbitrators because "manifest disregard requires awareness of

13

the relevant law." *Id.* The Sixth Circuit found that, even if the arbitrators in *Dawahare* had "misapplied the law of damages" in the arbitration, there was "no evidence that the arbitrators were aware of some relevant law on damages that they chose to ignore, and we question whether the damages evidence presented by Dawahare required any particular outcome." *Id*.

*Schafer v. Multiband Corp.* also demonstrates the increasingly stringent limitations on the scope of the "manifest disregard" doctrine as a basis to overturn an arbitration award. 551 F. App'x 814 (6th Cir. 2014). There, in a reasoned decision, an arbitrator found that 29 U.S.C. § 1110 (a provision of ERISA) bars all private indemnification agreements between plan fiduciaries and third parties. *Id.* at 817-18. The arbitrator's construction of the statute was contrary to Sixth Circuit precedent and, apparently, all other federal court precedent on the issue. *Id.* at 818. The Sixth Circuit characterized the decision as "legally unsupportable under this circuit's precedents" and stated that the court "would reverse the decision if it had been made by a district court." *Id.* at 819. Nevertheless, the Sixth Circuit held that the arbitrator had not manifestly disregarded the law in reaching his decision. *Id.* at 819.

> Legal error by the arbitrator – even clear legal error – is however not by itself sufficient for vacatur of an arbitration agreement. One of the advantages of arbitration is the avoidance of the expense of appeals, and the avoidance of such costs would be undermined by permitting appeals based on clear error of law. Even assuming that manifest disregard of the law is a basis for vacatur of an arbitral decision, the scope of the basis has to be very narrow. Manifest disregard of the law *is not just manifest error of law. If the arbitrator expressed disagreement with the law, rather than interpretation of the law,* that might suggest "disregard." But there is little evidence of that in the arbitrator's decision. Instead, the arbitrator relied on a very broad "plain" reading of the ERISA provision invalidating contractual provisions that relieve a fiduciary of liability, and relied on a narrow and formal meaning of the insurance exception to that provision. The arbitrator also relied on precedents that we can distinguish. Even together, however, this is not enough to show a manifest (as opposed to possible, or even likely) disregard (as opposed to questionable reading) of the law.

Moreover, the very idea that an arbitral decision is not appealable for legal error leads to the conclusion that the arbitrator is not necessarily bound by legal holdings of this court. If an arbitrator relies on a colorable meaning of the words of the statute – as the arbitrator did here – the fact that there is a Sixth Circuit precedent to the contrary is not necessarily determinative. Sixth Circuit holdings are binding in courts and on agencies whose decisions are appealable to the Sixth Circuit, ultimately because of that appealability. *An arbitrator cannot reject the law*, but can disagree with nonbinding precedent without disregarding the law.

*Id.* at 820 (internal citation omitted) (emphases added).

## ANALYSIS

### I. Overview

Meyers chose to include a mandatory arbitration clause in its brokerage agreement with the Goodmans. The arbitration took place before a highly sophisticated, knowledgeable, and distinguished panel of arbitrators chosen by the parties under FINRA procedures. The arbitrators heard evidence from both sides and considered the parties' respective legal positions. For reasons that are unclear, Meyers did not submit a pre-hearing brief, nor did it offer experts to counter the experts who testified for the Goodmans as to liability and damages. After the Panel found for the Goodmans, Meyers now seeks to overturn the Award issued from the arbitral forum in which Meyers compelled the Goodmans to assert their claims.

From the outset, Meyers faces an extremely difficult task. The standard for "manifest disregard" requires a showing that the Panel appreciated a controlling legal principle but consciously (*i.e.*, "manifestly") chose to disregard it. To make matters worse for Meyers, beyond a handful of citations to the *authorization* for certain types of damages awards, the Panel did not explain its reasoning in any respect. Meyers is left to speculate as to what legal principles the Panel may have ignored, without any indication that the Panel even appreciated those principles in the first place – let alone chose to ignore them.

Meyers faces another problem that effectively precludes some of its challenges premised on a "manifest disregard of the law." During the arbitration hearing, Meyers did not raise (or at least failed to sufficiently flesh out) several of the arguments it now asserts to this court on review. Logically, it would have been impossible, or at least extremely unlikely, for the Panel to have appreciated – let alone ignored – controlling legal principles that Meyers never raised or properly argued in the first place.

At any rate, Meyers makes numerous arguments that can be grouped into three categories. First, in numerous respects, Meyers asks the court to re-examine and re-evaluate the evidence presented to the Panel concerning the Goodmans' claims and Meyers' defenses. Second, it argues that, to the extent the Panel based its award on the TSA, the Panel manifestly disregarded the law by failing to find that the TSA claim was time-barred. Third, Meyers argues that the Award should at least be vacated or modified to limit damages in certain respects.

## II. <u>Sufficiency of the Evidence</u>

Meyers argues that the Panel could not have found "churning" because the evidence did not sufficiently establish the three elements of churning: (1) control over the account by the broker; (2) trading in the account that is excessive in light of the customer's investment objectives; and (3) scienter (intent to defraud, or willful or reckless disregard of the customer's best interest). Meyers essentially urges the court to determine whether the evidence before the Panel established (1) a sufficient degree of control over the account by the broker, (2) whether the broker engaged in "excessive" trading in light of the customer's investment objectives, and (3) whether the broker intended to defraud or recklessly disregarded the Goodmans' best interests. Among other things, Meyers urges the court to consider whether the Goodmans had sufficient "financial acumen" to assess their own best interests or possessed sufficient

intelligence to evaluate their broker's recommendations, considerations that turn on a multitude of potential case-specific factors. Similarly, even after acknowledging that there is no *per se* test for "excessive activity," Meyers asks the court to evaluate whether the frequency of trades on the account was "excessive" in light of the Goodmans' stated objectives. Finally, they ask the court to find that there was insufficient evidence of scienter because the Goodmans discussed the transactions with Meyers representatives "extensively" and were "sophisticated consumers."

At the hearing, the Goodmans presented testimony to the Panel from themselves and from two retained experts, both of whom presented evidence related to the Goodmans' theory of churning. Meyers did not present any experts of its own on this issue. The Panel was entitled to weigh both the facts and the Goodmans' expert evidence in making factual determinations on the issue of churning. The Goodmans also presented legal authority standing for the principle that, with regard to their TSA claims, evidence of scienter was not required in the first place.

The court's role is not to conduct its own assessment of the sufficiency of conflicting evidence presented to the Panel, to evaluate whether the Panel did a good or bad job in weighing the evidence before it, or to assess whether the Panel should have found certain legal precedent more persuasive than other legal authority. As it relates to the churning theory, Meyers is not actually arguing that the Panel manifestly disregarded the law; instead, it is simply rearguing the merits of its case and the appropriate conclusions to draw from the evidence, considerations that do not provide grounds for overturning the Panel's decision. In particular, it is difficult to comprehend how the Panel could have "manifestly disregarded the law" in applying discretionary multi-factor tests to fact-based elements of a particular claim. At any rate, there are legally plausible grounds on which the Panel could have found churning, which again involves essentially factual determinations about "control," "excessiveness," and intent.

Even assuming that the law otherwise compelled a particular result under the facts presented (which it does not), there is no basis from which to conclude that the Panel consciously ignored a controlling legal principle. The Panel did not include the reasoning for its decision: thus, the court cannot say that the Panel appreciated the elements of a churning theory of liability but consciously chose to disregard one or more of those elements in its analysis.[12]

Meyers also contends that the Goodmans could not have prevailed on claims for negligence or breach of fiduciary duty because, as a matter of law, it owed no fiduciary duty to the Goodmans.[13] In its petition here, Meyers cites several cases holding that a broker does not owe a fiduciary duty with respect to a non-discretionary customer account, essentially reiterating the arguments it asserted to the Panel in its Answer to the Goodmans' Statement of Claim. In their pre-hearing brief, which was submitted to the Panel after Meyers submitted its Answer, the Goodmans presented the Panel with cases that have reached the opposite conclusion, namely that

---

[12] In its briefing here, Meyers contends that the Goodmans only presented their claims as a "churning" case. That representation is patently inconsistent with the record, including Meyers' own representations to the Panel. In its closing argument to the Panel, Meyers' counsel stated as follows:

> There are really three general categories of claims that are in this case. *One is suitability* and it really focused on an excessive use of margin. *The second is churning* and *the third is a failure to supervise.* . . . [E]ssentially, it's really *those three claims* and it's framed as common law claims and claims under the Tennessee Securities Law.

(Docket No. 26, Ex. C to Schrader Decl., 1/20/14 Hearing Tr. at 10:15-24 (emphases added)). The Panel could have adopted one or all three of these theories of liability – not just "churning" – under the claims presented.

[13] Meyers also asserts that it could not be held liable as an insurer of performance on the Goodmans' account. The Goodmans never argued this basis for liability to the Panel, and there is no indication (or reason to believe) that the Panel relied on it as a basis for liability in the Award. The court will therefore address the fiduciary duty basis for liability, which the Goodmans did advance in the arbitration.

a broker *does* owe a fiduciary duty to its customer, provided that the broker controls the non-discretionary account. (*See* Goodmans' Pre-Hearing Brief at p. 10 (citing *DeKwiatkowski v. Bear Stearns & Co.*, 306 F.2d 1293 (2d Cir. 2002); *Vogel v. A.G. Edwards & Sons, Inc.*, 801 S.W.2d 746 (Mo. Ct. App. 1990).) The Goodmans asserted that the evidence would show that Meyers' brokers controlled the Goodmans' account.

Meyers has not demonstrated that there was a controlling legal principle here that necessarily precluded a finding of a duty running to the Goodmans. The Panel could have found the Goodmans' argument and supporting caselaw to be persuasive as to whether Meyers owed a fiduciary duty to the Goodmans under the circumstances presented. Furthermore, Meyers has not cited any part of the record in which the Panel acknowledged the law concerning fiduciary duty but consciously chose to disregard it. For both of these reasons, even assuming that the Panel found liability based on a breach of fiduciary duty (which is not clear), the Panel would not have manifestly disregarded the law in holding Meyers liable for a breach of fiduciary duty.

Meyers also argues that there was insufficient evidence to show "suitability," a theory premised on assessing whether the investment strategy was reasonable and appropriate under the totality of the circumstances.[14] Suitability claims require material misstatements or omissions, indicating an intent to deceive or defraud, in connection with the purchase or sale of a security. *See Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993); *see also Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, 493 (6th Cir. 1990). Meyers argues that, if the Panel

---

[14] Meyers seems to assume that a suitability theory of liability only supported the Goodmans' TSA claim, but that is not a necessary inference from the Award. Because the Award is not a reasoned decision, the court cannot rule out the likelihood that the Panel considered evidence related the "suitability" of the investment strategy in connection with its consideration of the Goodmans' non-statutory claims, which sounded in both fraud and negligence.

based its decision on suitability (which is not clear), the evidence was insufficient to sustain the Award. Among other things, Meyers argues that the plaintiffs failed to show any material misrepresentations and failed to prove loss causation.

Again, Meyers is asking the court to undertake its own qualitative analysis of the evidence presented to the Panel, which is not appropriate. The issues that Meyers presents are factual determinations that turn on a multitude of factors and a careful weighing of the evidence presented during the hearing. Whether the Panel drew the correct inferences from the facts presented is beyond the scope of this court's limited review. At any rate, the court finds no indication that, as to suitability, the Panel acknowledged controlling precedent regarding "suitability" but chose to disregard it.

Finally, Meyers argues at length that the Panel should have found that, for one of several reasons, the Goodmans' claims were precluded because they failed to mitigate their damages or otherwise contributed to them. First, by reference to state caselaw authority, Meyers argues that the Goodmans had a general duty to mitigate their damages and that, as applied to their brokerage account, the Goodmans' damages should have been "frozen" on the date that they discovered (or should have discovered) fraud or errors in their account. Meyers contends that the Goodmans were at least on inquiry notice of their churning claims as of the date they received confirmation statements and, as a consequence, their failure to report the matter contemporaneously to Meyers necessarily precludes their claims. Second, Meyers argues that "many courts" have found that claims against a broker were barred under the doctrines of waiver, estoppel, ratification, or "avoidable consequences." Meyers seems to suggest that the same facts supporting its "mitigation" defense also support these potential defenses.

This set of challenges fails for many of the same reasons as Meyers' other challenges. Meyers has not shown that any controlling legal principle required a particular result in the arbitration. In their pre-hearing brief, the Goodmans included a substantial discussion of Meyers' "mitigation"-related defenses, in which the Goodmans introduced legal authority for the proposition that Meyers' defenses were inapplicable in the context of an intentional tort. (*See* Pre-Hearing Brief at 17-18 (referencing *Morgan, Ohmstead, Kennedy & Gardner, Inc. v. Schipa*, 585 F. Supp. 245, 249 (S.D.N.Y. 1984).) The Goodmans reiterated this principle and the *Morgan* case in its closing argument. (*See* Schrader Decl., Ex. E.) The Panel was entitled to rely on the authority cited by the Goodmans. Furthermore, determining when an investment holder knew or should have known of his or her injury is a fact-specific question that involves a careful weighing of the evidence – a consideration entirely within the Panel's discretion to determine. Finally, there is no indication that the Panel acknowledged or appreciated a controlling principle and "manifestly" chose to disregard it. Again, the court's role is not to evaluate whether the arbitrators committed clear error with regard to the facts or the law, which is what Meyers seeks here. With regard to Meyers' affirmative defenses, the court finds no indication of manifest disregard of the law by the Panel.

### III. <u>Statute of Limitations</u>

Meyers argues, based on the time limitations set forth in the Tennessee Securities Act, that the Panel manifestly disregarded the law by failing to find that the Goodmans' TSA claims were time-barred. Under the TSA, "[n]o action shall be maintained under this section unless commenced before the expiration of five (5) years after the act or transaction constituting the violation or the expiration of two (2) years after the discovery of the facts constituting the

violation, or after such discovery should have been made by the exercise of reasonable diligence, whichever first expires." Tenn. Code Ann. § 48-1-122 (current 2014).

The parties dispute whether Meyers properly raised a statute of limitations defense to the Panel in the first place. Meyers did not assert the TSA statute of limitations as an affirmative defense in its Answer, either in substance or in its list of additional defenses. Meyers did not submit a pre-hearing brief on this issue. There is no indication that, prior to the close of proof in the arbitration, Meyers introduced a TSA statute of limitations defense into the proceedings at any point. Meyers only mentioned a statute of limitations defense in its closing argument to the Panel – after the close of proof– reflecting its first reference to this defense in approximately *three years* of arbitration proceedings. At the time, counsel for Meyers simply directed the Panel to an exhibit that the Goodmans had submitted (containing a Westlaw printout of Tenn. Code Ann. § 48-1-122 and caselaw annotations) and stated as follows:

> [It] talks about a two year statute of limitations for claims under the Tennessee Securities Act. And this case was filed in November 2010, thus anything before November 2008 is time barred and in fact this account was closed in August 2008.

(1/20/14 Hearing Tr. at p. 11.). This short quote constituted the entire substance of Meyers' argument on this point before the Panel. Meyers did not reference the "discovery" rule, the alternate five-year statute of repose, the issue of fraudulent concealment as a potential grounds for tolling the statute of limitations, or any evidence relating to these doctrines. Meyers did not introduce any caselaw authority of its own relating to this provision.

In response to Meyers' closing, counsel for the Goodmans' offered a competing construction of the statute and its applicability to the facts of the case. Goodmans' counsel stated as follows:

> Now Mr. Schrader brought up some interesting areas of defense. You know one
> is the statute of limitations on our Securities Act claim. He said it's two years, it's
> two years from discovery, it's five years from the transaction date. So we're well
> within the statute of limitations. Mr. Goodman brought the case as soon as he
> found that he was being defrauded well within the five year period.

(Schrader Decl., Ex. E, 1/20/14 Hearing Tr. at p. 3.)

For the first time, Meyers *now* argues with some force that the evidence demonstrates that the Goodmans "clearly" knew about their injuries by August 2008 and that the Goodmans failed to introduce facts showing fraudulent concealment by Meyers. Meyers also now argues, for the first time, that caselaw authority interpreting the TSA places the burden to show fraudulent concealment on a claimant. *See Dean Witter Reynolds, Inc. v. McCoy*, 853 F. Supp. 1023, 1037 (E.D. Tenn. 1994). Based on that authority, Meyers contends that the Goodmans cannot benefit from the five-year statute of repose because they failed to allege or introduce evidence showing fraudulent concealment.[15]

Meyers' arguments again come too late. The Panel cannot have manifestly disregarded caselaw, legal authority, or a proposed construction of the facts that was not presented to it. Meyers made a brief, simplistic, and incomplete argument at the eleventh hour concerning the statute of limitations. Meyers did not argue to the Panel that the Goodmans had a burden to show fraudulent concealment; nor did it otherwise place the Goodmans (or the Panel) on notice that evidence concerning accrual or fraudulent concealment would be relevant during the hearing. In terms of the evidence, Meyers did not identify for the Panel (as it now attempts to do in support of its petition here) any specific evidence showing that the Goodmans' TSA claim

---

[15] During the arbitration proceeding, Meyers was represented only by New York-based counsel. However, in connection with the Petition to Vacate, Meyers retained Tennessee-based counsel. Meyers now asserts a host of arguments concerning Tennessee law for the first time.

must have accrued as of August 2008, other than the fact that the account was closed that month. Although that evidence may have been adduced during the hearing, Meyers did not highlight it in making its cursory statute of limitations argument. Meyers cannot utilize its Petition for Review as a means to retrofit the arguments it made to the Panel.

Even if Meyers had made an adequate legal argument to the Panel, it is not clear that the Panel would have been required to find for Meyers in any case. Based on the facts presented during the hearing or its construction of the TSA, the Panel might have (1) construed the TSA as permitting the Goodmans five years in which to sue (as the Goodmans urged the Panel to do), (2) found that the Goodmans did not discover the facts supporting their injuries until November 2008 or later (a question of fact that this court may not disturb),[16] or (3) found some type of fraudulent concealment by Meyers. Also, as the Goodmans point out, at least some courts have construed "churning" as a unified offense that "can only be based on a hindsight analysis of *the entire history of the statement of the claim*." *Miley v. Oppenheimer*, 637 F.2d 318, 327 (5th Cir. 1981) (emphasis added). Taken cumulatively, there are multiple "legally plausible" lines of argument that could have supported a finding that the TSA claim was timely.

At most, Meyers has a reasonable argument that the Panel may have made a clear error of law or engaged in poor factfinding, and that, in hindsight, Meyers might have prevailed *if* Meyers had fleshed out its argument at any point during the arbitration process. However, the possibility of clear error alone is insufficient to establish a manifest disregard of the law.

---

[16] The TSA incorporates the discovery rule, whereby the statute of limitations begins to run not only when the plaintiff possesses actual knowledge of a claim, but also when the plaintiff possesses actual knowledge of "facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of the wrongful conduct." *Redwing v. Catholic Bishop for the Diocese of Memphis*, 363 S.W.3d 436, 459 (Tenn. 2012) (internal quotation marks omitted).

Additionally, even if there were a controlling legal principle here that was clearly defined and should have resulted in denial of the TSA claim, the record contains no indication that the Panel acknowledged that the TSA statute of limitations would otherwise have barred the claims yet consciously chose to disregard that controlling law.

On a final note, even assuming *arguendo* that the TSA claim was untimely, the Goodmans brought additional common law claims that are not subject to the TSA's statute of limitations provision. Meyers does not contend that those claims were untimely. At most, dismissing the TSA claim would affect only the nature and measure of damages – not Meyers' liability.[17]

IV. **Damages**

A. **Compensatory Damages**

The Panel awarded the Goodmans compensatory damages reflecting the total amount of losses in their accounts. Meyers argues that, if the Panel found for the Goodmans based on a churning theory of liability, the compensatory damages award should have been limited to the commissions that the Goodmans paid.

First, there are multiple plausible grounds on which the Panel could have awarded the Goodmans the total amount of the losses in their accounts. Under the TSA, a successful claimant receives the net out-of-pocket losses plus interest, not just the commissions. *See* Tenn. Code § 48-1-122. The Panel could have based its compensatory damages award on the statutory formula. Second, as to the common law claims, the Panel could have determined that the

---

[17] The only damages award necessarily related to the TSA claim is the Panel's punitive damages award.

entirety of the losses in the account were the result of fraud or negligence, for which the Panel sought to hold Meyers liable and make the Goodmans whole.

Also, Meyers is again making arguments in hindsight.  Meyers did not present an expert witness concerning damages (or any other topic), and it did not file a legal brief on damages.  It is not clear that Meyers even presented to the Panel the legal authority it now cites, nor has Meyers identified any portion of the record in which it explained to the Panel what it believes to be the law on damages for a "churned" account.  By contrast, the Goodmans presented damages calculations through an expert witness and submitted a pre-hearing brief that contained substantial legal authority for the proposition that the appropriate measure of damages included both the commissions and the loss in value of the account, under both the TSA and the common law.  (*See* Pre-Hearing Brief at pp. 11-14.)  The Panel was entitled to rely on the evidence and legal authority presented by the Goodmans in rendering its damages award.

In sum, there were plausible legal grounds for the Panel's compensatory damages award, there was no countervailing controlling legal principle for the Panel to ignore, and there is absolutely no indication that the Panel acknowledged a controlling legal principle but consciously chose to ignore it in rendering its compensatory damages award.

### B.  Prejudgment Interest

The Panel purported to award prejudgment interest to the Goodmans under Tenn. Code Ann. § 47-14-123 (hereinafter, "§ 123").  That provision states that "[p]rejudgment interest . . . may be awarded by courts or juries in accordance with the principles of equity."  *Id.* (emphasis added).  Meyers argues that, by its plain terms, the statute authorizes only courts or juries to award prejudgment interest but that it does not similarly authorize arbitrators to award prejudgment interest.

Meyers' argument may be correct in substance: the statute *could* be read as not authorizing arbitrators to award prejudgment interest. The principal problem for Meyers is that it never made this argument to the Panel. The plaintiffs demanded prejudgment interest in their initial Statement of Claim and specifically demanded prejudgment interest "pursuant to the Tennessee Securities Act and Tennessee's prejudgment interest statute" in its pre-hearing brief. The pre-hearing brief contains a discussion section specific to § 123, in which the Goodmans quote § 123, contend that it authorizes an award of prejudgment interest, and ask the Panel to award prejudgment interest under the statute. (Pre-Hearing Brief at p. 15.) Thus, even before the hearing commenced, Meyers was on notice that the Goodmans sought prejudgment interest under § 123.

Despite being on notice of the Goodmans' construction of the statute, Meyers never argued that the Panel should construe § 123 as precluding an award of prejudgment interest. Meyers is making this argument in hindsight. Accordingly, this court cannot find that the arbitrators "manifestly disregarded" a competing construction of the statute that Meyers never actually raised; indeed, it appears that the Goodmans' position concerning authorization for prejudgment interest under § 123 was unrebutted. Accordingly, the Panel understandably may have relied on the Goodmans' unrebutted construction of the statute. Moreover, Meyers does not cite any authority for the proposition that § 123 must be read as not authorizing an award of prejudgment interest in an arbitration proceeding. Even if that were the only reasonable construction, there is no indication that the Panel appreciated that § 123 is only susceptible to one construction and chose to disregard that construction in favor of its own brand of "industrial justice." *Stolt-Nielsen*, 559 U.S. at 671.

Once again, Meyers is attempting to raise potentially meritorious legal arguments well after the fact. Whatever the merits of Meyers' proposed construction in the abstract, Meyers cannot prevail on a "manifest disregard" challenge by asserting a *post hoc* legal challenge to the Panel's award, where Meyers was on notice of a competing construction of the statute but declined to challenge it before the Panel rendered its decision.[18]

On a final note, Meyers points out that it is unclear from the Award whether prejudgment interest should be calculated based on the compensatory damages award, exclusive of punitive damages. Meyers argues that, because prejudgment interest is not meant to be punitive, prejudgment interest must be calculated relative to the compensatory damages award only. The Goodmans do not dispute this point. Accordingly, the court construes the arbitration award as requiring prejudgment interest only relative to the compensatory damages portion of the Award.

## C. Punitive Damages

Meyers argues with some force that the Panel should not have awarded punitive damages because the Panel failed to weigh and make findings concerning the relevant punitive damages factors. Again, Meyers seeks to raise new arguments on review that it never asserted to the Panel.

In *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992), the Tennessee Supreme Court restated the standard for punitive damages in Tennessee and announced new procedures governing "trials" involving punitive damages claims. The court stated that "punitive damages" should be awarded only with respect to "the most egregious of wrongs," so as not to "dull[] the

---

[18] Here, it is significant that, during the arbitration proceedings, Meyers was represented by counsel and did not object to the Goodmans' assertion that prejudgment interest could be awarded by the Panel under Tennessee law.

potentially keen edge of the doctrine as an effective deterrent of truly reprehensible conduct."
*Id.* at 901.  Thus, the court held that punitive damages could only be awarded if a defendant acted (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly, as shown by "clear and convincing evidence."  *Id*.

The *Hodges* court also announced new optional procedures for trials involving punitive damages:

> In a *trial* in which punitive damages are sought, the court, *upon motion of defendant*, shall bifurcate the trial.  During the first phase, the factfinder shall determine (1) liability for, and the amount of, compensatory damages and (2) liability for punitive damages in accordance with the standards announced above. During this phase, evidence of a defendant's financial affairs, financial condition, or net worth is not admissible.
>
> If the factfinder finds a defendant liable for punitive damages, the amount of such damages shall then be determined in an immediate, separate proceeding.  *During this second phase*, the factfinder shall consider, to the extent relevant, at least the following:
>
> (1) The defendant's financial affairs, financial condition, and net worth;
>
> (2) The nature and reprehensibility of defendant's wrongdoing, for example (A) the impact of defendant's conduct on the plaintiff, or (B) the relationship of defendant to plaintiff;
>
> (3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;
>
> (4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;
>
> (5) The expense plaintiff has borne in the attempt to recover the losses;
>
> (6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;
>
> (7) Whether, and the extent to which, defendant has been subject to previous punitive damages awards based upon the same wrongful act;

(8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

*Id.* at 901-902 (emphases added). Also, "[a]fter a *jury* has made an award of punitive damages, *the trial judge* shall review the award, giving consideration to all matters on which the jury is required to be instructed. *The judge* shall clearly set forth the reasons for decreasing or approving all punitive awards in findings of fact and conclusions of law demonstrating a consideration of all factors on which the jury is instructed." *Id.* at 902 (emphases added). The Tennessee Supreme Court reiterated the *Hodges* holding in *Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326 (Tenn. 1996). Finally, in *Goff v. Elmo Greer & Sons Constr. Co., Inc.*, 297 S.W.3d 175 (Tenn. 2009), the Tennessee Supreme Court articulated additional factors concerning whether the amount of the punitive damages award comports with federal due process rights, an inquiry that involves consideration of (1) the degree of reprehensibility of the defendant's conduct, (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases." *Id.* at 191 (citing *BMW of N. Am. v. Gore*, 517 U.S. 559, 574-75 (1996)).

Apparently for the first time, Meyers contends that the Panel disregarded the law by failing to consider the various factors identified in *Hodges* (as to whether punitive damages should be awarded) and *Goff* (as to whether the size of the punitive damages award was appropriate).

There are several problems with Meyers' argument. First, Meyers again asks this court to find that the Panel "manifestly disregarded" allegedly controlling precedent that Meyers never argued to the Panel in the first place. In their pre-hearing brief, the Goodmans demanded punitive damages under Tennessee law, citing *Coffey* and *Hodges* for the proposition that punitive damages may be awarded when a plaintiff proves, by clear and convincing evidence, that the defendant acted intentionally, fraudulently, maliciously, or recklessly. That articulation of the basic legal standard was correct. Despite numerous opportunities to do so, Meyers apparently did not argue to the Panel that it should consider the *Hodges* factors or the additional factors referenced in *Goff* concerning excessiveness.[19] The Panel's Order reflects its conclusion that punitive damages should be awarded under *Coffey* and *Hodges*, cases on which the Goodmans appropriately relied in arguing to the Panel. Under the prevailing legal standard, the Panel reasonably could have concluded that the Goodmans proved scienter by clear and convincing evidence. The record does contain evidence that Meyers' agents may have abused the Goodmans' accounts in order to line their own pockets. At any rate, there is no indication that the Panel "consciously disregarded" any controlling legal authority actually presented or argued to it. For this reason alone, Meyers' argument fails.

Second, the *Hodges* court explicitly stated that bifurcation and the associated procedures only applied upon a motion by the defendant; it says nothing about what procedures a court should employ – or what factors the court must weigh – where a defendant does not request bifurcation. Here, there is no indication that Meyers urged the Panel to bifurcate the proceedings and to conduct them in accordance with the analysis set forth in *Hodges*. The court cannot find

_____

[19] In fact, it does not appear that the Panel was even made aware of the *Goff* case.

that the Panel "manifestly disregarded" an optional procedure that Meyers never purported to invoke during the arbitration. Meyers' challenge fails for this independent reason as well.[20]

Finally, as to size of the punitive damages award, Meyers has not shown that it presented the *Goff* or *Gore* factors to the Panel. Regardless, the Panel's award of $100,000 in punitive damages amounts to less than 50% of its compensatory damages award, a ratio of less than 1:1, which is well within constitutional limits. *See, e.g.*, *McLemore ex rel. McLemore v. Elizabethton Med. Investors, Ltd. P'ship*, 389 S.W.3d 764 (Tenn. Ct. App. 2012); *BMW*, 517 U.S. at 581; *Wilson v. Am. Sys., Inc.*, 2014 WL 791936, at *6-*7 (Tenn. Ct. App. Feb. 25, 2014).[21]

## V. **Summary**

With respect to arguments that Meyers did raise to the Panel before it issued the Award, Meyers has not shown that it presented a controlling legal principle to the Panel or that the Panel "manifestly disregarded" any such controlling law. As to arguments that Meyers asserts for the first time in support of its Petition to Vacate, the court cannot find that the Panel manifestly disregarded controlling legal principles that were never presented to it, and at least some of the arguments do not involve controlling legal principles in the first place.

---

[20] It is also notable that, after announcing the legal standard, the *Hodges* court articulated facts that expressly apply to a "jury" and a "trial judge." Even if Meyers had argued to the Panel about the *Hodges* factors (which it did not), it is not clear that the *Hodges* court factors were intended to bind the arbitrators in the first place, because the Panel was neither a "judge" nor a "jury."

[21] In 2011, Tennessee enacted a statute that limits punitive damages to double the compensatory damages award or $500,000, whichever is greater. *See also* Tenn. Code Ann. § 29-39-104. Whether or not this law applies in an arbitration, the Goodmans filed their statement of claim before the statute became effective and the Panel's punitive damages award falls well within these statutory caps.

The manifest disregard basis for vacating an arbitration award is exceedingly difficult to demonstrate, particularly where, as here, the arbitrators did not explain their reasoning. Meyers has not demonstrated that the Panel exhibited manifest disregard for the law in any respect when rendering its decision. Accordingly, the Award is final, binding, and will not be vacated. The court will construe the prejudgment interest portion of the award as requiring the payment of prejudgment interest on compensatory damages only. Subject to that caveat, the court will not qualify the Award in any fashion.

## CONCLUSION

Subject to the court's construction of the Award as requiring the payment of prejudgment interest relative to compensatory damages only, the Petition to Vacate will be denied and the Cross-Petition to Confirm will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge